Norman GOLDFARB, Acting Regional Director of the Third Region of the National Labor Relations Board for and on behalf of the National Labor Relations Board, Petitioner,

v.

SERVICE MOTOR FREIGHT, INC., Respondent.

No. 76–CV–505.

United States District Court, N. D. New York.

Feb. 4, 1977.

National Labor Relations Board, Paul V. Mulkern, Jr. and Richard L. Ahearn, Albany, N. Y., of counsel, for petitioner, Region 3—Albany Resident Office.

Arthur Liberstein, New York City, for respondent.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

This is a motion brought by the National Labor Relations Board (hereinafter "N.L.R.B.") on behalf of Local 294 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter "Local 294") to enjoin, pursuant to 29 U.S.C. § 160(j), allegedly unfair labor practices being committed by the Respondent, Service Motor Freight, Inc. (hereinafter "Service"). Specifically, the N.L.R.B. claims that Service prematurely recog-

nized Teamsters Local 807 as the bargaining agent for Service's Feura Bush operations, and subsequently engaged in practices aimed at encouraging its employees, many of whom belonged to Local 294, to join Local 807. The Petitioner prays for an injunction restraining Service from recognizing Local 807, and from committing any acts tending to foster Local 807's position as the recognized bargaining agent for Service's Feura Bush employees.

## FINDINGS OF FACT

1. Respondent Service is a common carrier engaged in interstate trucking, as are B. L. Motor Freight (hereinafter "B.L.") and Harry L. Blades (hereinafter "Blades"), the three carriers being subsidiaries of Capital Corporation. Service drivers are divided into two classes, those being "spotters" and "over-the-road haulers". Spotters generally transfer loaded truck trailers from the manufacturer's loading dock to a nearby point where they are "dropped" and left to be picked up by over-the-road drivers. Those drivers then deliver them to their ultimate destination. Service's Feura Bush road drivers generally deliver loads to several different states. Upon completing delivery of a load, a road driver then calls a central dispatch (now located in Newark, Ohio), and may be assigned either a return load or one to another destination. In this way, a driver may be "in the system" for up to two weeks before returning to Feura Bush, and could travel anywhere in the forty-eight continental United States.

2. A total of six facilities are maintained by Respondent Service, one in Maryland, three in New Jersey, and two in New York. The New York facilities are located in Tallman and Feura Bush, the latter exclusively servicing Owens-Corning Fiberglass.[1]

3. At the present time, Service employees based in New York and Maryland are

---

1. Respondent also claims, as part of the alleged New York bargaining unit, a Blades facility (Respondent's Memorandum of January 13, 1977, at p. 3). However, there has been no showing of any drivers located at that facility. In fact, respondent relies upon only the five Tallman drivers in attempting to satisfy the thirty-percent rule discussed *infra*.

represented by Teamster's Local 807, while Service drivers based in New Jersey are represented by Teamster's Local 676.

4. Walter Carpenter is the Manager of Road Operations for the Eastern Division of Capital Corporation operations. As such, he serves as Supervisor for Blades, Service, and B.L.

5. Gerald M. Spayde serves as the Manager of Road Drivers for the Eastern Division of Capital Corporation.

6. Francis "Whitey" Carlton is the Service Operations Manager, serving as Operations Manager of the Feura Bush facility. While the drivers rarely see Carlton more than one or two times a week, they receive their orders from him. It is Carlton who authorizes their days off and reprimands them when required.

7. Sometime in May of 1976, Lawrence Gilbert, a representative of Local 807, approached Carpenter, seeking recognition of that Local as bargaining agent for all Service drivers based in New York. The basis for the request was the fact that four of the five drivers then employed by Service at the Tallman facility had joined Local 807, as evidenced by Exhibits C, D, E and F.

The request was verified by a letter sent by Gilbert to Carpenter on May 28, 1976 (Exhibit 8).

8. By letter dated June 4, 1976, Service recognized Local 807 as bargaining agent for the employees based at Tallman, New York (Exhibit 7). There was a total of five drivers employed by Service at Tallman at the time.

9. On June 8, 1976, Service, by letter, (Exhibit 9) granted recognition of Local 807 as bargaining representative of Service drivers at Feura Bush, New York, although, at the time, there were no Service drivers at Feura Bush.

10. On June 25, 1976, following negotiations, two separate but identical (in content) collective bargaining agreements were reached by Service and Local 807, covering the Tallman and Feura Bush facilities (Exhibits 10 and 11). On that date, there were five Service employees at Tallman and eight at Feura Bush.

11. The following drivers were hired by Service for (or transferred to) the Feura Bush facility; also noted is any prior union affiliation.

| NAME | DATE STARTED | INTERVIEWED BY | INTERVIEW DATE | PRIOR UNION |
|---|---|---|---|---|
| Howley | 6/20/76 | Carpenter | 5/76 | L. 676 |
| Ballard | 6/15/76 | Carpenter/Spayde | | |
| Brock | 6/21/76 | Carpenter | 3/76 | L. 294 |
| Meigs | 6/24/76 | Spayde | 3/76 | L. 294 |
| Lejeunesse | 6/29/76 | Spayde/Carpenter | 4/ 1/76 | L. 294 |
| Horton | 6/24/76 | Spayde/Carlton | 6/16/76 | |
| Naylor | 7/ 1/76 | Carlton | 6/76 | Albany Local |
| Champagne | 7/ 1/76 | Carlton/Spayde/Carpenter | 6/30/76 | L. 294 [2] |
| Clark | 7/76 | Spayde | | L. 294 |
| Scott | 6/24/76 | Spayde | | L. 294 |
| Pittz | 8/16/76 | | 8/10/76 | L. 294 |
| Berdon | 8/24/76 | Carlton | 8/ 9/76 | L. 294 |
| McGoff | 8/19/76 | Carlton/Spayde | 8/16/76 | L. 294 |

12. When originally interviewed for the job with Service, many of the drivers were told that the Feura Bush operation would be non-union. Others were informed that it would be a union shop, but it was unknown what local would be involved.

13. After reporting to Feura Bush, the drivers were given packets containing various items relating to membership in Local 807 (Exhibit 1), generally by Carlton. The drivers were asked to fill them out and return them. Among those items contained in the packets was a dues deduction card.

14. Some of the drivers filled out and returned the forms contained in Exhibit 1, while others did not. Those who did not,

2. Champagne joined Local 294 in 1973, but withdrew in 1974.

nevertheless, continued to work for Service at Feura Bush.

15. Some drivers who failed to return the forms for membership in Local 807 were informed by Carlton that Service might have to fire them if they did not join Local 807.

16. Service deducted dues for Local 807 from some of the Feura Bush drivers' pay in August, September and October, of 1976. Some of the drivers whose pay was so affected had not signed and returned dues deduction authorization cards to Service.

17. No representative of Local 807 met with or conversed with the Service drivers at Feura Bush.

18. On August 12, 1976, Local 294 petitioned for an election for the Feura Bush operation to determine the appropriate majority bargaining agent.

## CONCLUSIONS OF LAW

### I. JURISDICTION

■ This Court has subject matter jurisdiction in the case by virtue of the fact that Service operates as a common carrier engaged in interstate shipment of goods. 29 U.S.C. §§ 151, 152(6 & 7); *N. L. R. B. v. Fainblatt,* 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014 (1939); *Kennedy v. Construction, Production & Main Laborer's Union,* 199 F.Supp. 775 (D. Arizona 1961). The testimony received adequately supports the conclusion that activities of Service's Feura Bush drivers were substantially related to interstate commerce.

### II. MERITS

■ The applicable test for granting relief sought under 29 U.S.C. § 160(j) is two-pronged. There must be shown reasonable cause to believe the violation alleged was in fact committed. *Seeler v. Trading Port, Inc.,* 517 F.2d 33 (2d Cir. 1975); also, cf. *National Maritime U. of Amer. v. Commerce Tankers Corp.,* 457 F.2d 1127 (2d Cir. 1972); *Shore v. United Bro. of Carpenters, Etc.,* 316 F.Supp. 426 (W.D.Pa.1970). Put in other terms, there must be present reasonable grounds to believe that the N.L.

R.B. charges will ultimately be sustained by the Board. *National Maritime U. of Amer. v. Commerce Tankers Corp., supra.* The second prong of the test involves a finding that the relief sought is just and proper. *Seeler v. Trading Port, Inc., supra.* While the various circuit courts of appeals have disagreed upon the exact test to be used, *Greene v. Senco, Inc.,* 282 F.Supp. 690 (D.Mass.1968), the Second Circuit, recognizing that injunctive relief is an extraordinary remedy, has stated that it should be granted only to preserve the status quo, or to prevent irreparable harm. *McLeod v. General Electric Company,* 366 F.2d 847 (2d Cir. 1966). One of the considerations in arriving at this conclusion is that the very nature of 29 U.S.C. § 160(j) is such as to short-circuit, temporarily, the N.L.R.B., thereby depriving the parties of the expertise of the Board. *Id.* The Second Circuit has nevertheless recognized, as a corollary, that preservation of a status quo is not favored when that status is the recognition of a bargaining agent which does not in fact represent an uncoerced majority of employees. *Seeler v. Trading Port, Inc., supra.*

#### A. *Reasonable Cause*

■ There·can be no doubt that an employer's recognition of a union which does not represent an uncoerced majority of employees is an unfair labor practice within the meaning of 29 U.S.C. § 158(a)(1) and 158(a)(2). *Garment Workers v. N. L. R. B.,* 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); *N. L. R. B. v. Hunter Outdoor Products, Inc.,* 440 F.2d 876 (1st Cir. 1971). This is so, regardless of any lack of knowledge on the part of the employer as to whether or not the union actually constitutes such a majority. *Id.* In this particular case, it is clear that Local 807 did not represent a majority of the Fuera Bush Terminal employees, inasmuch as the recognition of it as such came prior to the hiring of any employees. In any event, the evidence tends to show that none of the workers ultimately hired at Fuera Bush belonged to Local 807. By way of contrast, a substantial number of them were cardholders in Local 294.

Respondent claims, however, that recognition of Local 807 as bargaining agent for the Fuera Bush drivers was proper, based upon the principles outlined in *N. L. R. B. v. General Extrusion Company, Inc.,* 121 N.L.R.B. 1165 (1958). In *General Extrusion,* it was held that an employer having increased operation in size *but not nature* could continue to recognize a bargaining agent previously representing an uncoerced majority of employees in the unit, even though the number of employees working after the increase negated the majority status of the agent. As a general rule of thumb, the Board indicated that an operational change could be considered one of size rather than nature if: 1) more than thirty percent (30%) of the employees in the bargaining unit were employed prior to the charge, *and* 2) fifty percent (50%) or more of the job classifications ultimately existing were extant prior to the operational increase. It is this thirty-percent rule which, as the Respondent claims, is crucial to this case. It is Respondent's contention that the bargaining unit in issue in all of Service's New York operations, which, of course, is comprised of the employees at Feura Bush and at Tallman. As such, on June 4, and again on June 8, Local 807 represented a four-fifths (⅘) majority of all of Service's New York drivers. On June 25, when the final agreement was reached, a total of thirteen drivers were employed by Service in New York. Thus, it is claimed, the thirty-percent rule of *General Extrusion* was satisfied, and recognition of Local 807 was proper, and did not represent an unfair labor practice.

Assuming, without deciding, that Respondent has satisfied the thirty-percent rule with respect to its New York operations, as outlined above, it is clear that the Respondent has failed to deal with an issue upon which the *General Extrusion* doctrine hinges; that is, whether or not all of Service's New York operations is an appropriate bargaining unit. The cases dealing with this issue are conflicting. In *N. L. R. B. v. Tryon Trucking,* 192 N.L.R.B. 764 (1971), the Board found, based upon the facts, that the appropriate unit was employer-wide, rather than any single terminal. See also, *N. L. R. B. v. Helms Motor Express, Inc.,* 107 N.L.R.B. 132 (1953). However, the Board in *Tryon* stated that under some circumstances, a single terminal may be more appropriate as a bargaining unit. In *Ace Doran Hauling & Rigging Co. v. N. L. R. B.,* 462 F.2d 190 (6th Cir. 1972), the Court upheld a board finding that two Cincinnati terminals, out of a twenty-five terminal multistate operation, constituted an appropriate unit.

The appropriateness of any particular bargaining unit is strictly a matter for the expertise of the Board. *American Can Co. v. N. L. R. B.,* 535 F.2d 180 (2d Cir. 1976); *Dick v. Sinclair Glass Company,* 283 F.Supp. 505 (N.D.Ind.1967). This Court has found no cases involving *District Court* findings of appropriate bargaining units. In fact, the Court in *Dick* expressly held that, for purposes of 29 U.S.C. § 160(j), mere reasonable cause must be demonstrated and that complex matters, *including determining the appropriate bargaining unit,* should be left to the Board. Accordingly, Respondent's argument fails if there is reasonable cause to believe that Service's New York operation is not an appropriate bargaining unit.

It should be noted that, were this Court faced with the problem of determining the appropriateness of Service's New York operations as a bargaining unit, it would have no difficulty in finding that it is not an appropriate unit. The mere fact that Local 807 is not recognized as a system-wide bargaining agent, but merely one for New York and Maryland based employees, weakens Respondent's position and negates the applicability of the *Tryon Trucking* and *Helms Motor* cases. The Respondent has offered no rational explanation for viewing New Jersey as a separate unit apart from Maryland and New York operations. This Court therefore finds that there is reasonable cause to believe that Service's New York operation is not an appropriate unit. As such, the *General Extrusion* principles are inapplicable.

Based upon the foregoing, this Court finds reasonable grounds to believe that Respondent committed an unfair labor practice in improperly recognizing Local 807 as bargaining agent for Feura Bush drivers, and thereafter fostering that Local's existence at the Feura Bush operation.

### B. *Just and Proper Relief*

■ There can be little dispute that when an unfair labor practice results in the recognition as bargaining agent of a union which does not represent an uncoerced majority of employees, injunctive relief is not only just and proper, but is required to prevent an irreparable entrenchment of the improper union. *Seeler v. Trading Port, Inc., supra* ; *McLeod v. General Electric Company,* 366 F.2d 847 (2d Cir. 1966); *Greene v. Senco, Inc.,* 282 F.Supp. 690 (D.Mass.1968). The only question, then, is the scope of the injunctive relief to be granted. In *McLeod,* the Second Circuit took a very restrictive position, holding that an injunction should be granted only to such an extent as required to preserve the status quo and prevent irreparable harm. *Dick,* relying upon *McLeod,* therefore granted injunctive relief only insofar as Respondent's support of the second, illegitimate union was concerned. The Court there refused to order the Respondent to bargain with the first union until the Board, in its expertise, had determined the appropriate bargaining unit, and hence, which union actually was entitled to represent employees at the newly acquired plant.

The Second Circuit seemingly retreated from this restrictive viewpoint in *Seeler,* wherein it did grant injunctive relief which, in effect, ordered the defendant company to recognize the union losing the election, where the prevailing union did not represent a majority of uncoerced employees. However, that case involved a clearly unfair labor practice, and it was relatively certain that the Board would ultimately recognize the losing union as that one actually representing a majority of employees. In this case, however, as in *Dick,* the deter-mination of which union should be recognized at Feura Bush may well hinge upon the Board's determination of the appropriate bargaining unit, and is therefore very much in issue. For this reason, relief should be limited to enjoining Respondent's recognition of Local 807, and the concomitant activities (dues deduction, etc.). This, in fact, is all the relief the Board prays for in its petition.

### ORDER

It is hereby ordered that an injunction should be issued, pursuant to 29 U.S.C. § 160(j), restraining Respondent, its officers, representatives, agents, servants, employees, attorneys and all members and persons acting in concert or participating with it or them, pending the final disposition of the matters involved herein pending before the Board, from:

(a) Threatening its employees at its Feura Bush facility with discharge or other reprisals unless they join Local 807.

(b) Telling its employees and job applicants at its Feura Bush facility that it will not hire anyone who will not join Local 807.

(c) Interrogating its employees and job applicants by asking them to fill out a job application which contains a question asking to what union, if any, the applicant belongs.

(d) Demanding that its employees surrender to Respondent their membership cards, or withdrawal cards from Local 294 or other labor organizations.

(e) Deducting union dues for Local 807 from the paychecks of its employees, at its Feura Bush facility.

(f) Demanding or requesting that its employees at its Feura Bush facility fill out applications for membership in Local 807 and check-off authorization cards for Local 807.

(g) Urging and soliciting its employees at its Feura Bush facility to sign designation cards and check-off cards for Local 807 and/or to join Local 807.

(h) Assisting or contributing support to Local 807 or to any other labor organization.

(i) Recognizing or continuing to recognize Local 807 as the exclusive collective bargaining representative of its road driver and owner-operator employees at its Feura Bush facility unless and until such labor organization shall have been certified by the Board as such representative.

(j) Performing or giving effect to the collective bargaining agreement with Local 807, entered into on or about June 25, 1976, or to any extension, renewal or modification thereof, or to any other collective bargaining contract with Local 807 covering its Feura Bush facility employees which may now be in effect.

(k) Requiring its employees at its Feura Bush facility to pay dues and initiation fees to Local 807 as a condition of continued employment.

(*l*) In any other manner interfering with, restraining or coercing employees in the exercise of the rights guaranteed in 29 U.S.C. § 157.

It is so ordered.